## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LORI CHAVEZ-DEREMER,[1]<br>Secretary of Labor,<br>United States Department of Labor,<br><br>　　　Plaintiff,<br><br>v.<br><br>DIGNITY HOME CARE INC. and<br>M'MOUPIENTILA N'KENON N'DA a/k/a<br>MARC N'DA,<br><br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)　Civil Action No. 8:23-cv-465<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

In Opposition to the Motion for Judgment on the Pleadings and Memorandum in Support filed by Defendants Dignity Home Care, Inc, and M'Moupientila N'Kenon N'da aka Marc N'Da (hereinafter referred to as "Defendants"), Plaintiff, the Secretary of Labor, United States Department of Labor, states as follows:

In an effort to avoid liability for their violations of the Fair Labor Standards Act stemming from their failure to pay their domestic service employees the overtime owed, Defendants ask this court to ignore a Department of Labor ("Department") regulation that was promulgated through notice-and-comment rulemaking over a decade ago, under an express grant of statutory delegation of rulemaking authority recognized by the Supreme Court, and that has

---

[1] This action was commenced in the name of Julie A. Su, Acting Secretary of the Department of Labor. Ms. Su is now the former Acting Secretary of Labor and Lori Chavez-DeRemer is now the Secretary of Labor. Therefore, Ms. Chavez-DeRemer is being automatically substituted for Ms. Su as the Plaintiff, pursuant to Federal Rule of Civil Procedure 25(d), and the caption of this action is amended accordingly.

been repeatedly upheld by federal courts.[2]  This Court should deny Defendants' motion because the Secretary's Complaint contains facts sufficient on its face to establish Defendants violated the overtime and recordkeeping provisions of the Fair Labor Standards Act and all of Defendants' arguments regarding the enforceability of the relevant regulations must fail.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendants own and operate a home care services company in Douglas County, Nebraska that provides professional personal care attendants to assist people of all ages with activities of daily living.  Compl. ¶ 4, 7.  The Secretary, through the Wage and Hour Division ("WHD"), conducted an investigation into Defendants' employment and pay practices from December 23, 2019 through December 22, 2021 for compliance with the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").  *Id.* at 1.  WHD's investigation showed that Defendants violated the overtime and recordkeeping provisions of the FLSA due to repeated failure to pay their employees one-and-one-half times their regular rates of pay for hours worked in excess of 40 in a workweek and failure to keep records showing the total hours employees worked on a daily or weekly basis and hours worked when employees drove from one client's home to another.  *Id.* ¶¶ 11, 12.

The Secretary filed her Complaint on October 25, 2023, alleging repeated and willful violations of the overtime provisions of the FLSA as well as violations of the recordkeeping provisions of the FLSA.  Defendants filed their Answer on February 27, 2024, admitting that

---

[2] During the time period relevant to the allegations of FLSA violations in this case, the regulations addressed in Defendants' motion and this response were in effect.  However, the Department is currently reconsidering these regulations and may take a different policy approach in the future. *See* Proposed rule; request for comments, Application of the Fair Labor Standards Act to Domestic Service, 90 Fed. Reg. 28,976 (proposed July 2, 2025).

they provide professional personal care attendants to assist people of all ages with activities of daily living, Ans. ¶ 4, but denying any violations of the FLSA.  *Id.* ¶¶ 11, 12.

## STANDARD OF REVIEW

"Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law," the same standard used to address a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).  A complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Defendants, as the movants, have the burden of "clearly" establishing there are no material facts in dispute, and all reasonable inferences must be drawn in the Secretary's favor. *Rossley v. Drake Univ.*, 958 F.3d 679, 683 (8th Cir. 2020).

## ARGUMENT

### I.    The Secretary's Complaint Pleads a Valid Cause of Action under the FLSA

To plead a cognizable FLSA overtime claim, "Plaintiffs are required to plead coverage, that the employee worked more than 40 hours in one workweek, and that the employee was not paid overtime compensation." *Walkinshaw v. Saint Elizabeth Reg'l Med. Ctr.*, 428 F. Supp. 3d 171, 180 (D. Neb. 2019).  Defendants' motion does not argue the Secretary's complaint fails in any of these areas.  Rather, Defendants invoke the companionship services and live-in domestic service employee exemptions to the FLSA's overtime requirements to excuse their non-compliance with the law.  Because the pleadings do not clearly establish that Defendants may claim these exemptions, Defendants' motion for judgment on the pleadings must fail.

The Secretary is not required to plead facts establishing that an exemption to the FLSA does not apply.  Rather, "[t]he *employer* has the burden of proving the employee fits within one

3

of the FLSA exemptions." *Zimmerli v. City of Kan. City, Mo.*, 996 F.3d 857, 863 (8th Cir. 2021) (emphasis added). Because the employer bears that burden, "a complaint, seeking to recover under the wage and hour provisions of the [FLSA], is certainly not required to negative the exemptions of the statute in order to state a cause of action." *Stratton v. Farmers Produce Co.*, 134 F.2d 825, 827 (8th Cir. 1943). Defendants do not allege that the Secretary's complaint fails to sufficiently plead a cause of action under the FLSA. At this early stage, the allegations in the Secretary's complaint are sufficient to defeat Defendants' motion for judgment on the pleadings.

In addition to failing to identify any deficiencies in the Secretary's complaint, Defendants fail to show that the exemptions on which it relies apply. As a legal matter, for the reasons explained below, their attack on 29 C.F.R. § 552.109, which clearly prohibits home care agencies like Defendants from claiming the two relevant exemptions at all, fails. But even assuming that Defendants' legal arguments were to prevail and therefore they could potentially claim the exemptions, Defendants would still need to prove that the relevant exemptions factually applied to their employees. *Specht v. City of Sioux Falls*, 639 F.3d 814, 820 (8th Cir. 2011) ("When an employer contends it is exempt from the [FLSA], the employer has the burden of establishing the exemption clearly and affirmatively."). Specifically, Defendants would have to present evidence showing that their employees provide "companionship services" as defined by 29 C.F.R. § 552.6. The regulation's definition of those duties – which this action does not challenge – makes clear that "companionship services" primarily involve fellowship and protection, rather than "care" as that term is described in the regulation. *Id.* Similarly, to claim the exemption for live-in domestic service employees, Defendants would need to demonstrate they meet the requirements of 29 U.S.C. § 213(b)(21); that is, that its employees are "employed in domestic service in a household and … reside[] in such a household." The pleadings do not establish that Defendants

4

could claim the companionship services and live-in exemptions even in absence of the regulation prohibiting third party employers—like Defendants—from claiming the exemptions. Thus, because disputes of material fact remain unresolved and Defendants cannot demonstrate that they may claim either the companionship services or live-in exemptions as a matter of law, Defendants' motion must be denied. *Ashley Cnty., Ark.*, 552 U.S. 570 ("Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law").[3]

## II.    The Third Party Regulation Remains Valid

As their sole argument in support of their motion for judgment on the pleadings, Defendants attempt to challenge a decade-old regulation prohibiting third party employers, such as Defendants, from claiming an exemption to the FLSA's overtime requirements with respect to the home care workers they employ. Defendants invoke the companionship services and live-in domestic service employee exemptions, even though it is clear they may not claim these exemptions pursuant to 29 C.F.R. § 552.109. To dispute their FLSA liability, Defendants assert that the relevant regulation is somehow invalid. It is not. Sections 552.109(a) and (c) were properly promulgated in 2013 under an express statutory delegation of rulemaking authority that has been recognized by the Supreme Court, those provisions were affirmed by the D.C. Circuit Court of Appeals nearly a decade ago, and those provisions' validity has not been called into questions by subsequent Supreme Court caselaw. Thus, Defendants' arguments must fail.

---

[3] Defendants' motion also does not acknowledge the FLSA recordkeeping violations pled in the Secretary's Complaint. *See* Compl. 12. Even if Defendants could successfully avoid liability for their overtime violations based on the companionship services and live-in domestic service employee exemptions, they have made no argument to warrant dismissal of the alleged recordkeeping violations.

## A.  History of the Domestic Service Regulations

### i.  The FLSA and Relevant Amendments to the FLSA

The FLSA generally requires covered employers to pay a minimum hourly wage and, for hours of work exceeding 40 in a workweek, overtime compensation at a rate of one and one-half times the employee's regular rate of pay.  29 U.S.C. §§ 206(a), 207(a)(1).  Before 1974, to be covered by these minimum wage and overtime provisions, domestic service employees had to be "employed in an enterprise engaged in commerce or in the production of goods for commerce" or be individually "engaged in commerce or in the production of goods for commerce."  29 U.S.C. §§ 206(a), 207(a)(1) (1961); *see also* Pub. L. No. 87-30, §§ 5, 6, 75 Stat. 65, 67-69 (1961) (adding enterprise-wide coverage to FLSA's minimum wage and overtime pay provisions).  In 1974, an employer qualified as an "enterprise" if, among other things, it had more than $250,000 in gross annual sales.  29 U.S.C. § 203(s)(1) (1966); *see also* Pub. L. No. 89-601, § 102(c), 80 Stat. 830 (1966) (setting the amount of gross annual sales for enterprise-wide coverage to apply at $250,000 as of February 1, 1969).

In 1974, Congress amended the FLSA. Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, 88 Stat. 55 (1974). Among other provisions, the amendments included a section titled "Domestic Service Workers."  *Id.* § 7, 88 Stat. at 62 ("1974 domestic service amendments").  In that section, Congress extended the Act's minimum wage and overtime pay requirements to vastly more domestic service employees than had previously been covered by the Act by adding minimum wage and overtime provisions specific to domestic service employees.  *Id.* §§ 7(b)(1), (2), 88 Stat. at 62 (codified at 29 U.S.C. §§ 206(f), 207(*l*)).  In support of this significant expansion of FLSA coverage, Congress explicitly found that "the

employment of persons in domestic service in households affects commerce." *Id.* § 7(a), 88 Stat. at 62 (codified at 29 U.S.C. § 202(a)).

At the same time Congress extended the FLSA's wage requirements to more domestic service employees, Congress also added exemption provisions regarding certain circumstances in which the expansion of wage rights would not apply. First, Congress exempted from both the minimum wage and overtime pay requirements "any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." *Id.* § 7(b)(3), 88 Stat. at 62 (codified at 29 U.S.C. § 213(a)(15)) ("companionship services exemption"). Second, Congress exempted from the overtime pay requirement "any employee who is employed in domestic service in a household and who resides in such a household." *Id.* § 7(b)(4), 88 Stat. at 62 (codified at 29 U.S.C. § 213(b)(21)) ("live-in exemption").

The House and Senate Reports accompanying the 1974 amendments stated "[i]t is the intent of the committee to include within the coverage of the Act all employees whose vocation is domestic service." S. Rep. No. 93-690, at 20 (1974); H.R. Rep. No. 93-913, at 36 (1974). Additionally, the bill's sponsor, Senator Williams, in describing what is meant by "companion," stated:

> [T]he situation in which people are in a household not to do household work but are there, first, as babysitters. I think we all have the full meaning in mind of what a babysitter is there for—to watch the youngsters. 'Companion,' as we mean it, is in the same role—to be there and to watch an older person, in a sense.

119 Cong. Rec. at 24,801. Senator Burdick further explained that while being a companion may entail "some work" such as "making lunch for the infirm person," such work was "incidental to

7

the main purpose of employment," which was to "come in and sit with" an "aged father" or "aged mother." 119 Cong. Rec. at 24,801.

Congress granted the Department authority to implement the 1974 amendments through legislative rules. Specifically, Congress granted the Department authority "to prescribe necessary rules, regulations, and orders with regard to the [1974 amendments]." Pub. L. No. 93-259, § 29(b), 88 Stat. at 76. Furthermore, as to the 1974 domestic service amendments specifically, Congress authorized the Department to "define[] and delimit[]" the terms "companionship services," "babysitting services," and "domestic service employment," which Congress did not otherwise define or delimit. 29 U.S.C. § 213(a)(15).

ii. *The Department's 1975 Regulations Implementing the 1974 Domestic Service Amendments*

The Department issued regulations regarding the 1974 domestic service amendments in 1975. As relevant here, those regulations set out the types of activities and duties that constituted companionship services, 40 Fed. Reg. 7404, 7405 (Feb. 20, 1975) (codified at 29 C.F.R. § 552.6), and provided that the exemptions for companionship services and live-in domestic service employees could be claimed not only by an individual (or family member) who hired a worker directly, but also by "third party employers" such as agencies whose workforce works in private homes. *Id.* at 7407 (codified at 29 C.F.R. § 552.109(a), (c)). At the time the 1975 third party regulation was promulgated, the "vast majority" of "private household workers were employed directly by a member of [the] household," rather than by a third party employer. Emp't Standard Admin., U.S. Dep't of Labor, *Minimum Wage and Maximum Hours Standards Under the Fair Labor Standards Act* at 28 (Jan. 19, 1973) (reporting that "no more than two percent of the workers within the scope of the survey were in the employ of a household service business").

8

  *iii. The Supreme Court's 2007 Decision Regarding the Statutory Delegations of Authority and the 1975 Third Party Regulation*

In 2007, the Supreme Court in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007), upheld the 1975 regulation governing third party employment as a reasonable exercise of the rulemaking authority that Congress had delegated to the Department.  An employee of a third party home care agency argued that the Act precluded the regulation permitting third party employers from claiming the companionship services exemption.  *Id.* at 166.  In rejecting the challenger's argument, the Supreme Court concluded that "the text of the FLSA does not expressly answer the third-party-employment question."  *Id*. at 168.  Instead, having cited both Pub. L. No. 93-259, § 29(b), 88 Stat. at 76 and 29 U.S.C. § 213(a)(15) at the outset of its analysis, the Court concluded, "[t]he statutory language refers broadly to 'domestic service employment' and to 'companionship services'" and "expressly instructs the agency to work out the details of those broad definitions."  *Id*. at 167.  The Court concluded that "whether to include workers paid by third parties within the scope of the definitions is one of those details."  *Id*.  It reasoned that "whether, or how, the definition should apply to workers paid by third parties raises a set of complex questions," and that "[s]atisfactory answers to such questions may well turn upon the kind of thorough knowledge of the subject matter and ability to consult at length with affected parties that an agency, such as the [Department], possesses."  *Id*. at 167-68.  The Court concluded that it is "consequently reasonable to infer (and we do infer) that Congress intended its broad grant of definitional authority to the Department to include the authority to answer these kinds of questions."  *Id*. at 168.  The Court thus concluded the regulation was valid.  *Id.* at 162.

iv.  *The Department's 2013 Regulation Updating and Revising the*
*Regulations Implementing 1974 Domestic Service Amendments*

In 2013, through notice and comment rulemaking, the Department amended its 1975 regulations primarily to exclude third party employers from availing themselves of the companionship services and live-in exemptions, revise the definition of "companionship services," and revise the definition of "domestic service employment." 78 Fed. Reg. 60,454 (Oct. 1, 2013) ("2013 regulation").  The Department concluded that because of "changes to the home care services industry, the home care services workforce, and the scope of home care services provided," the 1975 regulations "no longer align[ed] with Congress's intent when it extended FLSA protections to domestic service employees."  *Id.* at 60,455.

As the Department explained in the 2013 rulemaking, when Congress enacted the 1974 amendments, the accompanying House and Senate committee reports made clear that the companionship services and live-in exemptions were not intended to apply to workers who have domestic service as their vocation or who earn their livelihood from such work.  78 Fed. Reg. at 60,454-456; S. Rep. No. 93-690, at 20 (1974); H.R. Rep. No. 93-913, at 36 (1974).  In the ensuing decades, however, the home care industry transformed into a multi-billion-dollar business with a professional workforce, far from the "neighbor" who casually "sits with" an older person.  78 Fed. Reg. at 60,454-456 (citing 119 Cong. Rec. 24,801 (1973) (Sen. Burdick)).

Specifically, "[i]n the 1970s, individuals who had significant care needs went into institutional settings."  78 Fed. Reg. at 60,458.  "Over time, however, our nation has come to recognize the importance of providing services in private homes and other community-based settings and of supporting individuals in remaining in their homes and communities."  *Id.*  The Department explained that this "shift is in part a result of the rising cost of traditional institutional care and has been made possible in significant part by the availability of government

10

funding assistance for home care under Medicare and Medicaid." *Id.* The growing demand for long-term home care services was also due to demographic increases in the percentage of elderly persons in the United States. *Id.* Moreover, the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999), which held it is a violation of the Americans with Disabilities Act for public entities to fail to provide services to persons with disabilities in the most integrated setting appropriate, "further solidified our country's commitment to decreasing institutionalization and has also influenced this important trend." 78 Fed. Reg. at 60,458.

The 2013 rulemaking record also established a nexus between third party employment and professionalization, explaining that employees of third party agencies often split time between multiple clients, work long hours, and provide comprehensive care services that in earlier decades would have been performed by attendants in facilities such as nursing homes. *E.g.*, *id.* at 60,458 (explaining that the shift from workers providing care in institutionalized settings to workers providing care in homes "has been made possible in significant part by the availability of government funding assistance for home care under Medicare and Medicaid"); *id.* at 60,480 (discussing comments reflecting that home care agencies' employees provide such care as their vocation, often pursuant to "training requirements and competency evaluations"); *id.* at 60,544 (noting that "[m]any who work overtime accrue long hours in the service of at least a few consumers [i.e., recipients of home care services], traveling between consumer homes during the workweek").

The Department also examined the purpose of the 1974 domestic service amendments and emphasized repeatedly that the changes to the law, when viewed holistically, were meant to expand FLSA coverage and the applicability of the Act's wage provisions to more types of domestic workers. The Department concluded that the amendments were not meant to deny

11

those wage standards to workers who—as employees of larger companies—would historically have been covered through FLSA's existing enterprise coverage provisions and therefore would have been, prior to the 1974 amendments, entitled to the Act's wage provisions.  For example, the Department explained that "the 1974 amendments were intended only to expand coverage to include more workers and were not intended to roll back coverage for employees of third parties who already had FLSA protections as employees of covered enterprises."  *Id.* at 60,481 (citing S. Rep. No. 93-690, at 20 (1974) ("The goal of the Amendments embodied in the committee bill is to update the level of the minimum wage and to continue the task initiated in 1961—and further implemented in 1966 and 1972—to extend the basic protection of the Fair Labor Standards Act to additional workers and to reduce to the extent practicable at this time the remaining exemptions.")).

Because of the vast expansion of the home care industry and growth in the number of third party employers, the Department revised its third party regulation, 29 C.F.R. § 552.109, to provide that third party employers may not avail themselves of the exemptions for companionship services or live-in domestic service employees.  Specifically, the 2013 regulations limited these exemptions by providing that only an individual receiving companionship services (i.e., the consumer) or members of the consumer's family or household may claim the companionship services exemption or the live-in exemption.  29 C.F.R. § 552.109(a), (c).  The Department explained that it was making this change "[t]o better ensure that the domestic service employees to whom Congress intended to extend FLSA protections in fact enjoy those protections."  78 Fed. Reg. at 60,454.  In addition, the Department amended its companionship services regulation, 29 C.F.R. § 552.6, to more clearly define the types of activities and duties that constitute companionship services such that the companionship services

12

exemption applies, and amended the regulatory definition of "domestic service employment," 29 C.F.R. § 552.3, to clarify the language and modernize the list of examples of professions that fall within that category.

The Department recognized that it was "changing its position as to the proper treatment of third party employers," but explained that the change was warranted in light of "the purpose and objectives of the [1974 domestic service amendments] as a whole," the "legislative history," and "the state of the home care industry" as it had developed over the previous decades. 78 Fed. Reg. at 60,482. The Department observed that home care workers employed by third parties in the industry today are "engaged in a formal, professional occupation" and that they "may well be the primary 'bread-winner[s]' for [their] famil[ies]." *Id*. The Department explained that it had accordingly concluded that "employees providing home care services who are employed by third parties should have the same minimum wage and overtime protections that other domestic service and other workers enjoy." *Id.*

Before the 2013 regulation went into effect, a group of trade associations representing third party home care agencies challenged the rule on the grounds that it was not a reasonable interpretation of the statute, and was arbitrary and capricious in violation of the Administrative Procedure Act. The D.C. Circuit unanimously upheld the 2013 regulation, concluding that it was a proper exercise of the Department's delegated authority. *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1087 (D.C. Cir. 2015), *cert. denied*, 579 U.S. 927 (2016). Specifically, the D.C. Circuit found that "[t]he Department has the authority to 'work out the details' of the companionship-services and live-in worker exemptions, and the treatment of third-party-employed workers is one such detail," *id*. at 1093 (quoting *Coke*, 551 U.S. at 165-68), and then

found the 2013 regulation to be an "entirely reasonable" effectuation of Congressional intent, *id.* at 1094.

**B. The Third-Party Regulation at 29 CFR § 552.109 Prohibiting Defendants from Claiming the Companionship Services or Live-In Domestic Service Employee Exemptions Remains Valid**

    i. *The FLSA Includes Statutory Delegations of Authority to the Department to Promulgate this Rule, as Contemplated in* Loper Bright

As Defendants are well aware, the 2013 regulation squarely forecloses Defendants from availing themselves of the FLSA's exemptions for companionship services or live-in domestic service employees.  Contrary to their assertion, *see* Def. Br. at 28-30, the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), does not affect the validity of the 2013 regulation.  Indeed, "DOL's authority to define which employers may claim the exemption was conclusively resolved by the Supreme Court in *Coke*, and *Loper Bright* has not changed that."  *Dep't of Lab. v. Americare Healthcare Servs., LLC*, 762 F. Supp. 3d 666, 685 (S.D. Ohio 2025).

In *Loper Bright*, the Supreme Court overruled the deference framework for interpreting statutes administered by federal agencies derived from *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  *See* 603 U.S. at 412-13.  The Court held that "the APA requires" that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."  *Id.*  The Court recognized, however, that "in a case involving an agency, … the statute's meaning may well be that the agency is authorized to exercise a degree of discretion."  *Id.* at 394.  The Supreme Court explained that Congress "often" enacts such statutory authorizations, such as by "expressly delegat[ing] to an agency the authority to give meaning to a particular statutory term," "empower[ing] an agency to prescribe rules to fill up the details of a statutory scheme," or authorizing the agency "to regulate subject to

14

the limits imposed by a term or phrase that leaves agencies with flexibility." *Id.* at 394-95 & n.5-6 (internal quotations and citations omitted). The Court further explained that "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency," the "role of the reviewing court" is to "identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Id.* at 395, 404. By "identify[ing] and respect[ing]" Congressional delegations of authority to administrative agencies, courts "stay out of discretionary policymaking left to the political branches." *Id.* at 404. And although courts should "not defer to an agency interpretation of the law simply because a statute is ambiguous," where "a particular statute delegates authority to an agency consistent with constitutional limits, courts *must* respect the delegation, while ensuring that the agency acts within it." *Id.* at 413 (emphasis added).

Here, Congress explicitly delegated to the Department the authority to promulgate regulations regarding the domestic service employee exemptions. In amending the FLSA in 1974 to cover domestic service employees generally and add the companionship services and live-in domestic service employee exemptions, Congress expressly authorized the Department "to prescribe necessary rules, regulations, and orders with regard to the" 1974 amendments. *See* 1974 Amendments, Pub. L. No. 93–259, § 29(b), 88 Stat. 76. Additionally, Congress instructed the Department to "define[] and delimit[]" the terms used in the statutory provision setting forth the companionship services exemption. 29 U.S.C. 213(a)(15). Indeed, the Court in *Loper Bright* specifically identified the companionship services exemption as an example of an express delegation that afforded the agency discretionary authority. *See* 603 U.S. at 394-95 & n.5; *see also Americare Healthcare Servs.*, 762 F. Supp. 3d at 684 ("[B]oth the 1974 Amendments and

15

§ 213(a)(15) of the FLSA unambiguously delegate authority to DOL to prescribe the rules and regulations to shape the parameters of the exemptions to the FLSA.").

Moreover, the Supreme Court's decision in *Coke* confirms that Congress expressly delegated authority to the Department to define the scope of the domestic service employee exemptions. In *Coke*, the Court held that the FLSA "expressly instructs the agency to work out the details" of the domestic service employee exemptions, and "whether to include workers paid by third parties within the scope of the definitions is one of those details." 551 U.S. at 167. In reaching this conclusion, the Supreme Court recognized that Congress delegated broad authority to the Department to implement the 1974 amendments through legislative rules. The power "to prescribe necessary rules, regulations, and orders with regard to the" 1974 amendments, the Supreme Court held, "provides the Department with the power to fill [statutory] gaps through rules and regulations." *Coke*, 551 U.S. at 165 (citing Pub. L. No. 93-259, § 29(b), 88 Stat. at 76); *see also Schaffner v. Monsanto Corp.*, 113 F.4th 364, 381 n.9 (3d Cir. 2024) (concluding that a statute authorizing the EPA Administrator "to prescribe regulations to carry out the provisions" of the statute is precisely the type of "express" delegation that "empower[s] an agency to prescribe rules to 'fill up the details' of a statutory scheme"); *see also Kansas v. Garland*, No. 24-cv-01086, 2024 WL 3360533 at *6 (D. Kan. July 10, 2024) (similar). Furthermore, the Court in *Coke* recognized that Congress granted the Department authority to "define[] and delimit[]" the term "companionship services," 29 U.S.C. § 213(a)(15), which is an additional source of authority to issue legislative rules. *Coke*, 551 U.S. at 162; *Loper Bright*, 603 U.S. at 394-95 & n.5; *see also Mayfield v. Dep't of Labor*, 117 F. 4th 611, 617-18 (5th Cir. 2024) (referring to "define and delimit" language related to the Act's exemption for employees employed in an executive, administrative, or professional capacity as an "uncontroverted, explicit delegation of

authority"); *Auer v. Robbins*, 519 U.S. 452, 457-58 (1997) (FLSA provision granting the Department of Labor authority to "define[] and delimit[]" an exemption gives the Department broad authority to issue legally binding rules). The Supreme Court's analysis in *Coke* therefore makes clear that the discretionary authority Congress assigned to the Department with the FLSA's 1974 statutory amendments are precisely the type of delegations that "courts must respect" under *Loper Bright*. 603 U.S. at 413; *see also Americare Healthcare Servs.*, 762 F. Supp. 3d at 685 (concluding that *Loper Bright* "does not impact the outcome" of a challenge to the 2013 regulation because "the delegation of statutory authority to [the Department] is clear and unambiguous").

Having recognized this discretionary authority, the Supreme Court in *Coke* also "fix[ed] the boundaries" of the delegations with respect to the third party employer question. *Loper Bright*, 603 U.S. at 371; *see also Coke,* 551 U.S. at 166 ("examin[ing]" the challenger's "claim[] that the regulation falls outside of the scope of Congress' delegation"). The Supreme Court explained that when the 1974 Amendments were enacted, the FLSA's minimum wage and overtime requirements already applied to some, but not all, domestic service workers paid by third parties. *See Coke*, 551 U.S. at 167. "[I]n finding it within the Department's 'broad grant' of authority to decide 'whether to include workers paid by third parties within the scope' of the companionship-services exemption, the Court explicitly contemplated that the full range of potential outcomes lay within the agency's discretion." *Weil*, 799 F.3d at 1092 (citing *Coke*, 551 U.S. at 167–68). The Court pondered:

> Should the FLSA cover *all* companionship workers paid by third parties? Or should the FLSA cover *some* such companionship workers, perhaps those working for some (say, large but not small) private agencies, or those hired by a son or daughter to help an aged or infirm mother living in a distant city? Should it cover *none*? How should one weigh the need for a simple, uniform application of

17

the exemption against the fact that some (but not all) third-party employees were previously covered?[4]

*Coke*, 551 U.S. at 167-68 (Court's emphases).  The Court held that it is "consequently reasonable to infer (and we do infer) that Congress intended its broad grant of definitional authority to the Department to include the authority to answer these kinds of questions."  *Id*. at 168.

Accordingly, pursuant to *Loper Bright*, the 2013 regulation must be upheld because the Department acted within "the outer statutory boundaries" of its delegations.  *See Loper Bright*, 603 U.S. at 374; *see also Mayfield*, 117 F. 4th at 617 (explaining that where there is a clear delegation of authority, "the question is whether the Rule is within the outer boundaries of that delegation").  Under the 2013 regulation, the exemptions for companionship services and live-in domestic service employees can be claimed by an individual (or family member) who hires a worker directly, but not by third party employers such as home care agencies that assign members of their workforce to particular homes.  *See* 78 Fed. Reg. at 60,557; 29 C.F.R. § 552.109(a), (c).  In other words, the 2013 regulation expressly adopted one of the potential options identified by the Supreme Court in *Coke*.  551 U.S. at 167-68.  Moreover, when the D.C. Circuit unanimously upheld the 2013 regulation, it concluded that the rule was a proper exercise of the Department's delegated authority.  *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1087 (D.C. Cir. 2015), *cert. denied*, 579 U.S. 927 (2016).  In *Weil*, the D.C. Circuit underscored that the "[Supreme] Court invoked the precise terms of § 29(b)'s general grant of implementation authority—the authority 'to prescribe necessary rules, regulations, and orders with regard to the

---

[4] As explained in the preamble of the 2013 rulemaking, prior to 1974, employees who worked for a third party large enough to be obligated to comply with the FLSA were covered by the FLSA even if they were domestic service employees assigned to work in someone's private home.  78 Fed. Reg. at 60,481-82.  By allowing those covered enterprises to claim the newly instituted domestic service exemptions, the Department's 1975 regulations denied those previously covered employees the Act's minimum wage and overtime protections.  *Id.*

amendments made by this Act'—in the portion of its opinion holding that the third-party-employment question had been delegated to the Secretary." 799 F.3d at 1092 (citing *Coke*, 551 U.S. at 165). The D.C. Circuit further explained that that the choice the Department made in promulgating the 2013 regulation was consistent with Congress's intent to include within the FLSA's protections all employees whose vocation is domestic service. *See id.* at 1094.

Even though the analyses in *Coke* and *Weil* did not have the benefit of the Court's instructions in *Loper Bright*, there should be no question that references in *Coke* and *Weil* to deference principles that *Loper Bright* overruled do not detract from the precedential value of those cases. The Supreme Court explicitly stated in *Loper Bright* that it was "not call[ing] into question prior cases that relied on the *Chevron* framework," and that such prior cases "are still subject to statutory *stare decisis* despite our change in interpretive methodology." 603 U.S. at 376; *see also Tennessee v. Becerra*, 117 F.4th 350, 366 (6th Cir. 2024) (noting that the Supreme Court in *Loper Bright* "cautioned litigants hoping to rehash or relitigate previously settled issues decided on *Chevron* that '[m]ere reliance on *Chevron* cannot constitute a special justification for overruling such a holding'" (quoting *Loper Bright*, 603 U.S. at 376)); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (recognizing that *stare decisis* principles "demand respect for precedent whether judicial methods of interpretation change or stay the same"). The Supreme Court's admonition that courts should adhere to the principle of statutory *stare decisis* has particular force here because both the Supreme Court and the D.C. Circuit Court of Appeals have concluded that the Department had authority to promulgate the current third party regulation. *See Americare Healthcare Servs*, 762 F. Supp. 3d at 685 (explaining that "the mere

19

fact that the D.C. Circuit relied on *Chevron* does not cast doubt on that court's holding in [*Weil*]").[5]

Additionally, courts that have examined this issue since *Loper Bright* have unanimously upheld the validity of the 2013 regulation. *See Su v. WiCare Home Care Agency*, No. 1:22-CV-00224, 2024 WL 3598826, at *15 (M.D. Pa. July 31, 2024) (explaining that, consistent with *Loper Bright*, because Congress delegated authority in the FLSA to the Department regarding the companionship services exemption, the Department "has the authority to shape the parameters of the Companionship Exemption, and this delegation is sufficiently unambiguous, such that the [c]ourt need not examine the appropriate level of deference to be given to this regulation"); *Americare Healthcare Servs.*, 762 F. Supp. 3d at 684-85 (explaining that "both the 1974 Amendments and § 213(a)(15) of the FLSA unambiguously delegate authority to DOL to prescribe the rules and regulations to shape the parameters of the exemptions to the FLSA" and that "[s]ince the delegation of statutory authority to DOL is clear and unambiguous, the *Loper Bright* decision does not impact the outcome here").

---

[5] Even when Congress does not delegate to an agency the discretionary authority to issue substantive regulations, *Loper Bright* reaffirms that courts may "seek aid from the interpretations of those responsible for implementing particular statutes," under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Thus, even had Congress not expressly delegated discretion to the Department to make the choices reflected in the 2013 regulation, under *Skidmore*, deference would be warranted to that Rule based on both the "validity" of the Department's "reasoning" and the "thoroughness" of its "consideration." 323 U.S. at 140. The Department issued its 2013 regulation through the notice-and-comment rulemaking procedures of the APA. As explained above, the Department's preamble to the rule detailed the dramatic changes in the home care industry as well as conducted an in-depth analysis of the legislative history and responded to the substantive issues raised by thousands of comments, and as such, thoroughly considered the relevant issues.

      *ii.   Defendants' Other Arguments are Unavailing and Belied by the Supreme Court's Holding in* Coke

      Defendants make an assortment of other arguments, contending that the Act's plain language prohibits the 2013 regulation; that the 2013 regulation is not consistent with Congressional intent; that the Department did not adequately address comments during notice and comment rulemaking; that the Department should somehow not be permitted to change its position despite changed circumstances; and that the 2013 regulation runs afoul of the major questions doctrine.  These arguments, which Defendants present without meaningful support and should not persuade this Court, are addressed in turn below.

      1.   Defendants' Analysis of the Statutory Text Ignores Precedent and Congressional Intent

      Defendants spend much time arguing that the text of the FLSA precludes the third party regulation.  *See, e.g.*, Def. Br. at 36-41.  But this argument has already been rejected.  As discussed above, *see* II.A.iii, *supra*, the Supreme Court specifically addressed it in *Coke*, stating that "the text of the FLSA does not expressly answer the third-party-employment question." *Coke*, 551 U.S. at 168.[6]  Similarly, the D.C. Circuit considered, and did not accept, this argument.  When the 2013 regulation was challenged shortly after promulgation, the district court held that the 2013 regulation conflicted with the plain language of the statute for the reasons offered by Defendants here.  *See Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d 138,

---

[6] Defendants also repeatedly cite Wage and Hour Advisory Memorandum (WHAM) No. 2005-1, Application of Section 13(a)(15) to Third Party Employers (Dec. 1, 2005), *see* Def. Br. 20, 42, 50, 51, a 20-year-old memo that explained the Department's position under its prior, 1975 regulations. While Defendants attempt to leverage this memorandum to support their plain language argument, it was written before the Supreme Court's 2007 determination that the text of the FLSA does not answer the third party employment question. Additionally, in the preamble to the 2013 rulemaking, the Department specifically addressed the 2005 WHAM, recognizing the Supreme Court's holding in *Coke* and further stating that "the WHAM failed to consider the industry changes that have taken place over the decades since the statutory amendment was enacted."  78 Fed. Reg. at 60,482.

145 (D.D.C. 2014), *rev'd*, 799 F.3d 1084 (D.C. Cir. 2015).  On appeal, the D.C. Circuit overruled the district court's decision, explicitly rejecting this position.  *See Weil*, 799 F.3d at 1090 (recognizing the district court's holding that "the Department's decision to exclude a class of employees from the exemptions based on the nature of their employers contravened the plain terms of the statute" and reversing that holding (internal quotations omitted)).

Likewise, Defendants' argument that Congress created the companionship services and live-in domestic service employee exemptions for the sole purpose of ensuring the affordability of companionship services, *see, e.g.*, Def. Br. at 10, 50, 53, ignores much of the legislative record discussing Congress's intent to provide FLSA protections to individuals for whom domestic service was their vocation.  Specifically, the 1974 House and Senate reports explained that, in extending the FLSA's protections to domestic service employees generally, Congress sought to foster "an effective and dignified domestic work force" by requiring "a living wage and respectable working conditions" and the companionship services exemption was not intended to apply to individuals who are domestic service workers as their "vocation" or who are "regular bread-winners or responsible for their families' support."  *See* 78 Fed. Reg. at 60,481 (citing House Report No. 93-913, p. 36); *see also Weil*, 779 F.3d at 1094 (noting that the Senate and House reports to the 1974 amendments "drew a contrast between 'casual' employees and employees whose 'vocation is domestic service.'" (citing S. Rep. No. 93690, at 20; H.R. Rep. No. 93-913, at 33-34, 36)).  The D.C. Circuit's analysis is instructive on this point; as already noted above, *see* I.a, *supra*, that court explained in *Weil* in upholding the 2013 regulation, "The Department's understanding is consistent with Congress's evident intention to 'include within the

coverage of the Act all employees whose *vocation* is domestic service.'" 799 F.3d at 1094

(quoting S. Rep. No. 93–690, at 20 (emphasis in original)).[7]

Defendants' attempt to use *Mayfield v. Dep't of Labor*, 117 F. 4th 611 (5th Cir. 2024) to

support their position, Def. Br. at 30, is perplexing.  In that case, the plaintiffs argued that the

Department's regulation setting forth the scope of a different FLSA exemption as to which the

Department has delegated authority was inconsistent with the statutory text, and the Fifth Circuit

held, with reasoning equally applicable here, that the regulation "is within the scope of [the

Department's] authority."  *Id.* at 618.  That the regulation contained a requirement not included

in the statutory text was not determinative because "[e]ven if Congress acted intentionally by

omitting [the relevant] requirement from the [relevant exemption], that does not mean that the

power it conferred excludes the option of imposing the requirement."  *Id.* at 619.  And as to

whether "the use of a proxy characteristic" is effectively "replacing" the statutory terms, *id.*

(concluding that no such problem existed in *Mayfield*), as Defendants suggest is the case with the

2013 regulation, Def. Br. 30-31 n. 15, 52-54, working as a home care provider for a third-party

employer is a strong proxy characteristic for home care workers whose vocation is domestic

---

[7] Defendants appear to suggest that Congress's failure after the Supreme Court's decision in *Coke* to change the 1975 version of 29 CFR 552.109 through legislation is somehow meaningful. *See* Def. Br. 24-25.  As the Supreme Court has cautioned, however, "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt."  *Bostock v. Clayton Cnty*, 590 U.S. 644, 670 (2020) (quoting *Pension Benefit Guaranty Corp.  v. LTV Corp.*, 496 U.S. 633, 650 (1990)).  Indeed, especially in light of the lack of Congressional intervention after the Department changed positions in 2013, the absence of legislative action may reflect Congress's agreement with *Coke* that the Department is best positioned to resolve "complex questions" regarding "whether, or how," the FLSA exemptions "should apply to workers paid by third parties."  551 U.S. at 167; *see id.* at 167-168 ("Satisfactory answers to such questions may well turn upon the kind of thorough knowledge of the subject matter and ability to consult at length with affected parties that an agency, such as the [Department], possesses."); *id.* at 165 ("The subject matter of the [prior third party employer] regulation [] concerns a matter in respect to which the agency is expert.").

service.  *See* Final Rule, Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,454, 60,480-82 (Oct. 1, 2013) (recognizing that the companionship services exemption was meant to exclude less professionalized workers, discussing comments reflecting that employment by a home care agency indicates that the arrangement is "formal," that the worker is providing services "as a vocation," and that the work is part of "the trade and business of providing services," and concluding that home care workers "employed by third parties are the sorts of domestic service employees Congress specifically intended the FLSA to cover: "[t]heir work is a vocation" and a worker "who has sought out work through a private home care agency is engaged in a formal, professional occupation"); *see also Weil*, 799 F.3d at 1094 (noting "Congress's evident intention to 'include within the coverage of the Act all employees whose *vocation* is domestic service'" (citing S. Rep. No. 93-690, at 20)).

Defendants' reliance on *Texas v. U.S. Dep't of Labor*, 756 F. Supp. 3d 361 (E.D. Tex. 2024), is also unpersuasive.  In addition to the obvious distinction that *Texas* was not addressing a regulation as to which a Supreme Court decision directly applied, that case also did not address a regulation specific to an industry that had undergone a "dramatic transformation," 78 Fed. Reg. at 60,481, in the decades since the promulgation of the regulation it was updating.  The practical results of the regulation given the exponential growth of third-party home care agencies between 1974 and 2013 does not mean, as Defendants suggest, the regulation "yields different results" than Congress intended or make the Department's decision to change the regulation inappropriate, Def. Br. at 50, but rather lends support to the Department's rationale for the 2013 regulation and consistency with Congressional intent.  *See, e.g.*, 78 Fed. Reg. 60,481 (explaining that "[t]he legislative history makes clear that in passing the 1974 amendments to the [FLSA], Congress intended to extend FLSA coverage to all employees whose "vocation" was domestic

24

service, but to exempt from coverage casual babysitters and companions who were not regular breadwinners or responsible for their families' support (citing House Report No. 93-913, at 36)); *see also id.* at 60,457 (highlighting testimony from the Senate floor manager of the 1974 amendments describing individuals who provide companionship services as "elder sitters" like "'a neighbor' who 'comes in and sits with' 'an aged father, an aged mother, an infirm father, an infirm mother.'" (quoting 119 Cong. Rec. S24774, S24801 (daily ed. July 19, 1973)). [8]

2. The Department Provided a Clear, Thorough, and Persuasive Explanation for the 2013 Regulation

Defendants also argue that the 2013 regulation is invalid because the Department neglected to provide a "reasoned response" to "significant comments" during the rulemaking process, Def. Br. at 47-51, because Defendants disagree with the Department's change in how it exercised its discretion to determine the scope of the live-in and companionship services exemptions. These allegations are inaccurate.

As an initial matter, Defendants' reliance on the fact that the Department had a different interpretation in the past, *see, e.g.*, Def. Br. at 37, 50-51, is unpersuasive and misconstrues *Loper Bright*. In *Loper Bright*, the Supreme Court noted the well-established principle that "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper*

---

[8] Moreover, contrary to Defendants' assertion, Def. Br. at 28-30, there is not a "circuit split" "with respect to the Companionship Services Exemptions at issue in this case." As discussed, *supra* sec. II.A.iv, the only Court of Appeals to evaluate the validity of the 2013 regulation unanimously upheld it. *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1087 (D.C. Cir. 2015), cert. denied, 579 U.S. 927 (2016). Similarly, as discussed *supra* sec. II.B.i, courts that have examined this issue after *Loper Bright* have also unanimously upheld the validity of the 2013 regulation. *See Su v. WiCare Home Care Agency*, No. 1:22-CV-00224, 2024 WL 3598826; *Americare Healthcare Servs.*, 762 F. Supp. 3d 666. And as discussed in this section, neither *Mayfield* nor *Texas* involve the regulations at issue in this case.

*Bright*, 603 U.S. at 394–95 (citations omitted). But *Loper Bright* noted in the very next paragraph that "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion" by expressly delegating to the agency authority to "give meaning to a particular statutory term" or to "prescribe rules to 'fill up the details' of a statutory scheme." *Id.* As explained above, *see* II.B.i, *supra*, both of these types of express delegations are present in this case.

Moreover, the Supreme Court has instructed that agencies are certainly free to change their minds, and that there is "no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). "[A]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) and *Fox Television Stations, Inc*., 556 U.S. at 515 (internal quotations omitted)). Accordingly, "courts should uphold an agency regulation if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action" and no "greater scrutiny is applied to agency actions that change or reverse a prior policy." *Americare Healthcare Servs*., 762 F. Supp. 3d at 685 (internal quotations and citations omitted).

As already discussed above, *see* II.A.iv *supra*, in promulgating the 2013 regulation, contrary to Defendants' contention otherwise, Def. Br. at 47-50, the Department offered a thorough and valid explanation for the change to the third party regulation and responded to all significant comments. It detailed the dramatic changes in the home care industry since the 1975 regulations, i.e., that home care exponentially expanded over several decades, evolving from

26

what were often casual relationships between neighbors into a lucrative, agency-based, largely government-funded industry employing a professionalized workforce. *See, e.g.*, 78 Fed. Reg. at 60,455-58. The Department explained that this transformation of the home care industry warranted a change in the Department's regulations.[9] Thus, the change that was effectuated by the 2013 regulation is permissible because the Department provided a "reasoned explanation for the change," *Wages and White Lion Investments*, 145 S. Ct. at 917, and was acting within its expressly delegated statutory authority to work out the details of the broad definitions in the exemptions, *Coke*, 551 U.S. at 167-68.

### 3. *Coke* Forecloses Defendant's Reliance on the Major Questions Doctrine

Defendants' argument about the major questions doctrine, Def. Br. at 44-46, is entirely misplaced. The major questions doctrine is a tool of statutory interpretation that the Supreme Court has used in certain "extraordinary cases" to determine whether an agency has the statutory authority it asserted. *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022). As explained above, the Supreme Court has already resolved the question of whether the Department has statutory

---

[9] The Department provided significant additional support in the administrative record for its decision to change the regulation, including data from the 15 states that already provided minimum wage and overtime protections to all or most home care workers employed by third parties, as well as comments from consumer representatives such as the AARP and disability rights advocates. Moreover, the rule included a comprehensive analysis of the economic impact of the regulatory changes on a wide array of constituencies, including consumers, workers, employers, and the public programs (such as Medicare and Medicaid) that pay for most home care services. *See* 78 Fed. Reg. 60454. Based on that analysis, the Department rejected industry claims that the amended regulations would harm consumers by denying them access to home care services or the reducing the quality of their care. To the contrary, the Department found that FLSA coverage would benefit not only the affected workers, "but also consumers because supporting and stabilizing the direct care workforce will result in better qualified employees, lower turnover, and a higher quality of care." *Id*. at 60459-60; *see also Weil*, 799 F.3d at 1095 (affirming that the Department's reasoning for changing the regulation was sound, concluding that there was "ample support" in the administrative record for the Secretary's determination that the recipients of home care "would be benefitted, not harmed, by the new regulations").

authority for the third-party employment regulation. In *Coke*, the Supreme Court explained that "satisfactory answers" regarding the third-party employment question "may well turn upon the kind of thorough knowledge of the subject matter and ability to consult at length with affected parties that an agency, such as the DOL, possesses," and the Court held that "Congress intended its broad grant of definitional authority to the Department to include the authority to answer these kinds of questions." *Coke*, 551 U.S. at 167–68.

Furthermore, this case has no resemblance to the handful of "extraordinary cases" in which the Supreme Court has invoked the major questions doctrine. *West Virginia*, 597 U.S. at 721. In *West Virginia*, for example, the Supreme Court held that a "little-used backwater" statutory provision did not authorize the EPA to promulgate the Clean Power Plan, which was projected to have a *trillion*-dollar impact on GDP, especially because the agency had "no comparative expertise" in making the relevant policy judgments in promulgating the Plan. *West Virginia*, 597 U.S. at 715, 729-30. In *Biden v. Nebraska*, 600 U.S. 477 (2023), the Supreme Court concluded that a statutory provision authorizing the Secretary of Education to "waive or modify any statutory or regulatory provision" governing student loan repayments, *id.* at 494 (quoting 20 U.S.C. § 1098bb(a)(1)), did not authorize the Secretary to create "a new program affecting 43 million Americans and $430 billion in federal debt," *id.* at 496, given that the Secretary's exercise of the statutory authority did "not remotely resemble how it has been used on prior occasions." *Id*. And, in a case also addressing a change to an FLSA exemption, the Fifth Circuit Court of Appeals recently held in *Mayfield v. U.S. Department of Labor*, 117 F.4th 611 (5th Cir. 2024), that the major questions doctrine did *not* apply to a challenge to a rule updating regulations governing the minimum wage and overtime exemption that applies to executive, administrative, and professional employees because (1) it involved "roughly $472

million in the first year" rather than "hundreds of billions of dollars"; (2) it affected 1.2 million workers, which is "a small percentage of the overall workforce" rather than "a significant portion of the American economy"; and (3) the specifics of an FLSA exemption are "not in line with the types of issues that have been considered politically contentious enough to trigger the doctrine." *Id.* at 616-17.

Here, by contrast, the Department has expertise in making policy judgments regarding the FLSA's implementation. The 2013 regulation did not involve a novel interpretation of an ancillary statutory provision to create an entirely new regulatory program; rather, the regulation was a straightforward exercise of expressly delegated authority to implement the 1974 amendments. And the economic impact of the 2013 regulation does not remotely resemble the regulatory actions challenged in *West Virginia* and *Nebraska*. *See West Virginia*, 597 U.S. at 715 (referring to a trillion-dollar impact); *Nebraska*, 600 U.S. at 496 (referring to affecting $430 billion in federal debt); *see also Mayfield*, 117 F.4th at 616 ("While no case has set the threshold for 'economic significance,' the recent cases applying the doctrine based on economic significance have involved hundreds of billions of dollars of impact." (citing *Nebraska* and *West Virginia*)). In contrast, the 2013 regulation was estimated to increase state Medicaid budgets by approximately 0.03 percent per year, and to result in total first-year impacts on employers providing home health care services of approximately $20.7 million, with additional transfers of approximately $210.2 million, depending on the approach employers chose to manage overtime hours. *See* 78 Fed. Reg. 60555. The Department further "determined that a full macro-economic analysis is not likely to show *any* measurable impact on the economy." *Id*. (emphasis added).

Finally, regarding whether the Department has claimed the relevant authority prior to issuing the rule in question, the Department has had regulations regarding the third party

29

question in place since 1975, one year after the amendments regarding domestic service employees were added to the FLSA. *Cf. Mayfield*, 117 F.4th at 617 ("[T]his is not an instance where the agency 'discover[s] in a long-extant statute an unheralded power to regulate "a significant portion of the American economy."' (citation omitted)). And, as established, the Department has promulgated those regulations pursuant to express statutory delegations of authority.[10]

## CONCLUSION

For the reasons explained above, the Secretary respectfully requests that the Court deny Defendants' motion for judgment on the pleadings.[11]

---

[10] Defendants' motion is not entirely clear regarding the relief they seek. *Compare* Def. Br. at 55 (requesting that this Court dismiss the Secretary's complaint) *with* Def. Br. at 48 ("The Third-Party exclusions should be invalidated"). To the extent Defendants are asking the Court to invalidate or vacate the 2013 regulation, that is not an appropriate remedy in this context. If this Court agrees with Defendants that some or all of the 2013 regulation is invalid, the correct remedy is to dismiss the relevant portions of the Department's enforcement action against Defendants. As Justice Kavanaugh explained, "in an enforcement action, a district court does not determine the validity of the agency order. … If the court of appeals in a facial, pre-enforcement action determines that the order is invalid and enjoins it, the agency can no longer enforce the order. *By contrast, if the district court disagrees with the agency's interpretation in an enforcement action, that ruling does not invalidate the order and has no effect on the agency's ability to enforce the order against others.*" *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 21 (2019) (Kavanaugh, J., concurring in the judgment) (emphasis added); *Baeder v. Heckler*, 768 F.2d 547, 553 (3d Cir. 1985) (in case reviewing agency's denial of an individual's disability benefits, affirming district court's holding that the challenged regulation was invalid and the district court's directive to the agency to proceed without reference to the invalid regulation, but explaining that district court did not have "the authority to issue an injunction aimed at controlling the [agency's] behavior in every disability case in the country"); *cf. United States v. Texas*, 599 U.S. 670, 696-99 (2023) (Gorsuch, J., concurring) (Administrative Procedure Act's provision permitting courts to "set aside" agency actions should be understood as permitting courts to disregard agency actions, not vacate them).

[11] At the very end of their motion, Defendants, in conclusory fashion, request certification of an immediate appeal to the 8th Circuit if the Court denies the motion. There is no basis for such an appeal, and the Secretary opposes this request also.

Respectfully submitted,

Jonathan L. Snare
Acting Solicitor of Labor

Christine Z. Heri
Regional Solicitor

Evert H. Van Wijk
Associate Regional Solicitor

s/Katharine K. Sangha_____
Katharine K. Sangha (MO #66196)
Attorney
2300 Main Street, Suite 10100
Kansas City, MO 64108
(816) 285-7260 (main)
(816) 285-7244 (direct)
(816) 285-7287 (fax)
Sangha.Katharine.K@dol.gov

Attorneys for the Secretary of Labor, United States
Department of Labor

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with Local Rule 7.1(d) and contains

10067 words, including the caption, headings, footnotes, and quotations. This word count was

provided by word count tool of Microsoft® Word for Microsoft 365 MSO (Version 2504 Build

16.0.18730.20220) 64-bit. I further certify that no generative artificial intelligence program was

used in drafting this brief.

s/Katharine K. Sangha

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the parties listed below:

F. Beau Howard
Nicholas B. Corser
FOX ROTHSCHILD LLP
999 Peachtree Street NW, Suite 1500
Atlanta, Georgia 30309
(404) 962-1000 (Phone)
(404) 962-1200 (Fax)
FBHoward@foxrothschild.com
NCorser@foxrothschild.com

Attorneys for Defendants

s/Katharine K. Sangha